# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHAELINA ABBATE,                    :
                                      :
    Plaintiff,              :
                                      :
v.                                    :          CIVIL NO.: 3-03-cv-1858(DJS)
                                      :
CENDANT MOBILITY SERVICES             :
CORPORATION,                          :
                                      :
    Defendant.              :

## MEMORANDUM OF DECISION AND ORDER

On October 29, 2003, plaintiff Michelina Abbate ("Abbate") filed this action alleging that

her employer, defendant Cendant Mobility Services Corporation ("Cendant"), discriminated

against her on the basis of her disability and age in violation of the Americans with Disabilities

Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq., and the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. §§ 621 et seq.  Abbate further alleged that Cendant's actions violated

the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq.,

and the Connecticut Family Medical Leave Act ("CFMLA"), Conn. Gen. Stat. § 31-51ll.[1]  On

June 23, 2004, this court dismissed Abbate's CFEPA and CFMLA claims.  (See dkt. # 26.)

Thereafter, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."),

Cendant moved for summary judgment (dkt. # 34) on plaintiff's remaining ADA and ADEA

---

[1]In her Complaint, Abbate did not allege that Cendant violated the federal Family and Medical
Leave Act ("FMLA").  (See dkt. # 1.)  Although Abbate did assert a CFMLA claim in her
Complaint, the court dismissed Abbate's CFMLA claim on June 23, 2004.  Abbate did not, at
any time during the course of this litigation, move for permission to amend her Complaint to
include a FMLA claim.  Curiously, however, Abbate devoted a significant potion of her
Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment to
discussing the FMLA.  This claim is not properly before the court at this time.  Should Abbate
want the court to consider the merits of her FMLA claim, she should file a properly supported
motion to amend her complaint.

claims. For the reasons set forth herein, defendant's motion **(dkt. # 34)** is **GRANTED in part and DENIED in part.**

## I. FACTS

Abbate began her employment relationship with Cendant in 1979 as an administrative assistant. Throughout Abbate's tenure at Cendant, she received regular merit increases and promotions. In August of 2000, Abbate began working as a real estate analyst. She continued in this position and was an employee in good standing until December 20, 2001, when she was "administratively terminated."

As a real estate analyst, Abbate supported real estate specialists and consultants. She processed documents relating to home closings and inspected real estate documents to assure that contingent conditions had been satisfied. While in this position, Abbate worked full-time and maintained a caseload of approximately 40 to 60 files. Abbate directly reported to Nancy Collins ("Collins"), the Manager of the Real Estate Analyst Team. Collins reported to the Director of Real Estate Services, Martha Tibbs ("Tibbs").

In July of 2001, Abbate was diagnosed with cancer of the uteris. She consulted with Dr. Robert Cooper ("Dr. Cooper"), an oncologist, who began a course of treatment at that time. Thereafter, Human Resources Manager Jennifer Saviano ("Saviano") sent to Abbate Cendant's disability benefits package, which included Cendant's policy for requesting a medical leave and a "Notice to Employee of Family Leave Obligations." On or about August 1, 2001, Abbate returned the completed forms. Abbate continued to work until August 28, 2001, when she started her leave of absence.

Abbate was hospitalized from August 29, 2001 through September 17, 2001. During

that time period, she underwent two surgeries. When she was released from the hospital, she began a regiment of home healthcare, antibiotics, chemotherapy, and radiation therapy. She received chemotherapy from October 1, 2001 to January 14, 2002.

Abbate asserts that while she was on medical leave, during the time period of October 2001 through December 2001, she made numerous phone calls to Cendant. The parties agree that, on or about December 19, 2001, Abbate called Tibbs to discuss her return to work. Abbate indicated that she wanted to return to work part-time for a couple of weeks and then work her way back to full-time, as her strength improved from the chemotherapy and radiation that she was receiving. She also asked Tibbs if she could temporarily work from home. Cendant does not dispute that Abbate inquired into temporarily working part-time or from home. Indeed, Tibbs testified that she "recall[ed] something to the effect of her [Abbate] asking, are there any part-time positions, and I told her not at this time, but - - because she needed a doctor's note it didn't matter," (dkt. # 50, Ex. 2, Tibbs Dep. at 50:15-18), since "we would have figured out a place to work with her . . . ." (Id. at 50:20-21). She further testified that it would not have been an undue hardship to allow Abbate to come back to work part-time in December 2001. (Id. at 111.) With respect to Abbate's request to work from home, Tibbs testified that Abbate's "position was a support position to a team which is very difficult to do off-site," (dkt. # 37, Ex. 3, Tibbs Dep. at 57:12-14), and that none of the other employees in that position worked off-site. Yet, Tibbs conceded that other employees who reported to her worked off-site. In sum, Tibbs testified that "I told her that she needed-in order to do that [come back to work], she would need to have a doctor's note, whether it was full-time or part-time." (Dkt. # 50, Ex. 2, Tibbs Dep. at 48:16-21.)

The parties dispute whether Abbate provided Cendant with a medical release form that cleared her to return to work. Abbate provided deposition testimony that, sometime prior to her telephone conversation of December 19, 2001, she mailed a medical release to Saviano.

Cendant argues that Abbate never submitted a medical release. Indeed, Cendant points to Abbate's deposition testimony, in which she admitted that she did not provide Tibbs[2] with a medical release and Saviano's affidavit in which she avers that she did not receive a medical release from Abbate's physician. Cendant also offers Abbate's deposition testimony wherein she admitted that she never followed up with Saviano to ask whether she had received the medical release. (Dkt. # 37, Ex. 2, Abbate Dep. at 53:23-54:15.)

Although Abbate has not produced a copy of the medical release, she offers Dr. Cooper's deposition testimony, during which he testified that, while he could not remember whether he released Abbate, it was possible that he may have released Abbate to work in late 2001 or early 2002. He observed, "it is consistent with what could occur during or following treatment, that patients will sometimes feel better, stronger, and will go back to work temporarily, or will attempt to go back to work and find they can't . . . ." (Dkt. # 50, Ex. 3, Cooper Dep. at 35:11-15.) He further testified that it was common for him to issue a medical release without keeping a copy of it in the patient's file. Abbate provided deposition testimony that she was cleared to return to work on or shortly after December 20, 2001. (Id., Ex. 1, Abbate Dep. at 33:8-10.)

Cendant, however, observes that, when Dr. Cooper was asked whether Abbate could have

---

[2]In addition, Tibbs testified that, on December 19, 2001, she asked Abbate whether she had a doctor's note, and Abbate responded that "she would get a doctor's note." (Dkt. # 50, Ex. 2, Tibbs Dep. at 48:23-24). Tibbs further testified that, to her knowledge, Abbate did not submit a doctor's note. (Id. at 49:1.)

returned to work when she was receiving chemotherapy between October [of 2001] and January 14th of 2002, he responded, "[l]ikely not." (Dkt. # 37, Ex. 4, Cooper Dep: 15:9-11.) Yet the record reflects that Dr. Cooper also testified, "I don't really know the exact nature of her work so as to say with certainty." (Id. at 15:21-22.)

Cendant argues that Dr. Cooper did not clear Abbate to return to work until June 2002. Yet, when Dr. Cooper was asked whether this was the case, he provided the following deposition testimony.

> Q.    Okay. But when you filled out those forms that we marked as exhibits, you were saying that her return-to-work date was June 26th of 2002 and not earlier than that, based on the information you had at the time?
>
> A.    Again, I don't - - I can't tell you as to whether or not there was some earlier return to work that did or didn't happen; and I was filling this out as of this point in time.

(Dkt. # 50, Ex. 3, Cooper Dep. at 40:14-20. )

Cendant argues that Abbate was administratively terminated because (1) it did not receive medical certification clearing Abbate to return to work, and (2) Abbate did not return to work following the expiration of her leave period. In support of its assertion that Abbate was terminated for failing to return to work following the expiration of her leave period, Cendant offers a letter from Saviano to Abbate, dated December 18, 2001. In the letter, Saviano informed Abbate that she was required to return to work by December 20, 2001, or her employment would be administratively terminated. Abbate, however, has produced evidence showing that she did not receive this letter until December 21, 2001.

Abbate contends that even though she received Saviano's letter of December 18, 2001, she did not return to work because she had already been told that she being terminated.

According to Abbate, she first learned of her termination on December 19, 2001, when she called Tibbs to arrange her return to work. Abbate testified,

> I called my supervisor, Martha Tibbs and told her that per Dr. Cooper's request I could come back part-time for a couple of weeks just to work back into the job and that I still had two more treatments of chemo and radiation and a radiation implant to go through, and I said I just wanted that just to ease back in so that - - you know, get back into the work force after being out for 14 weeks, 13 weeks. And she said, "Well, I'm sorry Micki. We don't do any part-time, or we can't let you do part time." And I asked her why, and she said because it wouldn't be fair to my coworkers. She said, "You've already been out 13 weeks."

(Dkt. # 37, Ex. 2, Abbate Dep. at 14:25-15:12.) Abbate argues that she was terminated because of her age and disability. She further alleges that her employer failed to accommodate her disability by refusing to allow her to return to work part-time or to work from home. For instance she testified, that there was a "double standard" because she knew of three other individuals in the real estate department who were allowed to work part-time. (Dkt. # 50, Ex. 1, Abbate Dep. at 21:13-22.) She admitted, however, that two of these three individuals were real estate specialists and one was a real estate analyst. (Dkt. # 37, Ex. 2, Abbate Dep. at 22:6-7.) During her deposition, Abbate also testified that two other individuals came back to work part-time after receiving treatments for cancer. (See id. at 23-24.) Abbate also offers the deposition testimony of Tibbs, wherein she conceded that Cendant had already begun advertising for a real estate analyst in the fall of 2001, while Abbate was still out on medical leave. (Dkt. # 50, Ex. 2, Tibbs Dep. at 181-182.)

With respect to her claim that she was terminated because of her age, she provided the following deposition testimony,

> Q     Explain to me why you believe your age was a factor in the decision to terminate your employment.

A.     Because I was getting near the 60-year-old mark, and they felt - - I felt that they would be hiring younger people at a lower salary.

(Id., Ex. 1, Abbate Dep. at 20:2-6.)  However, when Abbate was asked, "Did any supervisor tell you that the company was looking to get rid of your because of your age?" she responded, "No." (Id. at 20:22-24.)

Following her termination, Abbate underwent radiation therapy from February 14, 2002 to March 19, 2002.  Thereafter, she had a cesium insertion from March 25, 2002 through March 27, 2002.  While Abbate underwent various treatments for cancer, she received short-term disability benefits.  These benefits commenced on August 29, 2001.  Although the initial period of certification ended on October 9, 2001, they were continuously extended until approximately March 20, 2002, when Abbate received a letter from Aetna which determined that she was eligible for long-term disability benefits.  The letter read, "[w]e've reviewed your application for disability benefits and determined that you are now totally disabled from your usual occupation according to the terms of your group coverage . . . ."  (Dkt. # 37, Ex. 12.)  Abbate continued to receive long-term disability benefits until December 2002.

During this time period, Dr. Cooper completed a Physical Capabilities Form on behalf of Abbate, dated June 10, 2002.  Dr. Cooper certified that Abbate could comfortably work for five hours a day - of which she should not sit for more than two hours, stand for more than one hour, or walk for more than one hour.  Abbate described her job as requiring her to sit for six hours, stand for three hours, and walk continuously.

After Abbate's administrative termination, she spoke to Christopher Kyle ("Kyle"),[3] the

_____

[3]Kyle also encouraged Abbate to apply with the staffing agency that provided Cendant with employees.

Human Resources Manager, and Rosemary Butterly ("Butterly"), the Human Resources Director, about open part-time and full-time positions at Cendant. Abbate argues that she was excluded from a broad range of jobs, including the very position she held prior to her leave of absence, because she had to seek work at Cendant as an "outside applicant." She further argues that her status as an external applicant put her at a disadvantage because she was competing against other candidates who were still working at Cendant and were given preference for the job openings. In addition, Abbate asserts that she was only considered for entry level "Band B" positions, despite the fact that she had previously been working as a Real Estate Analyst, which was a higher level "Band C" position. Lastly, Abbate contends that she was only informed of three employment opportunities.

Abbate applied for three positions as an external applicant. She was then interviewed by Cendant for each of these positions. The positions included: initiation center administrator and two different accounting II positions. Cendant maintains that Abbate was not qualified for these positions because, when she was asked questions about her computer knowledge, she struggled with technical answers and was unfamiliar with different programs. Abbate counters that she was qualified for each of these positions and that she was not hired because of her age and disability. She provided the following deposition testimony,

Q      What positions do you believe you weren't offered because of your age?

A.      All three accounting positions.

Q.      Why did you think it was due to your age?

A.      Just by the people that interviewed me and their facial remarks and movements and just the questions they proposed to me.

Q.      What do you mean by facial remarks?

A.      In other words, you know, they asked you a question, and you could tell just by them looking at each other that you knew they were just doing it to be a formality, not sincere.

(Id., Ex. 2, Abbate Dep. at 75:8-19.)  Although Abbate admits that no one at Cendant told her that she was not hired because of her disability or age, she further testified that she was encouraged to retire and that the people who were hired in the accounting positions were younger than her.

Abbate filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 27, 2002.  A review of her Notice of Charge of Discrimination lists "12/20/2001," the date of her termination, as the earliest date of the alleged violation.  (See Dkt. # 40, Ex. 1.)  It also lists "12/20/2001" as the most recent date of the violation.  (See id.)  There is no record evidence that Abbate subsequently amended her EEOC charge to include her failure to hire claims.  Abbate received a Right to Sue letter from the EEOC dated July 29, 2003.  Her case was closed on July 29, 2003.   The Dismissal and Notice of Rights reads, "[h]aving been 30 days in which to respond, you failed to provide information failed to appear or be available for interviews/conference, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge."  (Dkt. # 37, Ex. 20.)

## II. DISCUSSION

Abbate complains that Cendant terminated her employment in violation of the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA").  She also claims that Cendant failed to hire her in violation of both the ADA and the ADEA.  Cendant denies liability on all counts and argues that it is entitled to judgment as a matter of law.

## A. STANDARD

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burdens of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

## B. ADA WRONGFUL DISCHARGE CLAIM

Abbate argues that, in terminating her employment, Cendant discriminated against her in violation of the ADA. The ADA provides that no covered entity "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42

U.S.C. § 12112(a). As the Second Circuit has observed, "ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973): A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDX IXIS N. Am., Inc., 445 F. 3d 161, 169 (2d Cir. 2006). To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). "Although each element must be established for an ADA plaintiff to prevail at trial, the 'failure to make reasonable accommodation, when the employee has satisfied the first three elements of his claims, amounts to discharge "because of" his disability.'" Rosso v. PI Mgmt. Assoc., L.L.C., No. 02Civ. 1702(KNF), 2005 WL 3535060, at *10 (S.D.N.Y. Dec. 23, 2005) (citing Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir. 2000)).

According to Cendant, Abbate's ADA claim fails for several reasons. First, Cendant contends that the doctrine of judicial estoppel precludes Abbate from proceeding with her ADA claim. Next, Cendant argues that Abbate cannot satisfy the "otherwise qualified" prong of the prima facie case. Lastly, Cendant argues that Abbate cannot show that Cendant's proffered reasons for her termination were pretext for unlawful discrimination. The court shall address

11

each contention seriatim.

Cendant argues that Abbate is estopped from arguing that she was otherwise qualified to perform the essential functions of her job because she applied for and received both short-term and long-term disability benefits from a private insurance company, Aetna. Cendant's argument fails because the mere fact that Abbate applied for and received disability benefits does not automatically estop her from claiming that she could perform the essential functions of her job. See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797-98 (1999). Indeed, in Cleveland,[4] the Supreme Court held,

> pursuit, and receipt, of SSDI [Social Security Disability Insurance] benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation.

Id. Thus, to survive summary judgment Abbate must "explain why [a statement of total disability made for the purpose of receiving disability benefits] is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'" Norville v. Staten Island Univ. Hosp., 112 Fed. Appx. 92, 94 (2d Cir. 2004) (citing Cleveland, 526 U.S. at 797-98); see also Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 7 (2d Cir. 1999). Here, Abbate has satisfied this requirement. The statements Abbate made in connection with her application for disability benefits can be reconciled with her

_____

[4]Courts have found that the Cleveland analysis is not limited to SSDI claims, and may be applied to Long Term Disability Claims. See Nodelman v. Gruner & Jahr USA Publishing, No. 98 civ. 1231(LMM), 2000 WL 502858, at *8 (Apr. 26, 2000); Norville v. Staten Island Univ. Hosp., 112 Fed. Appx. 92, 94 (2d Cir. 2004).

ADA claim because the statements she made with respect to disability benefits were made "in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." See Cleveland, 526 U.S. at 807; Nodelman v. Gruner & Jahr USA Publishing, No. 98Civ.1231(LMN), 2000 WL 502858, at *8 (S.D.N.Y. April 26, 2000) (finding that the "plaintiff [] proffered a sufficient explanation for the inconsistency of his claims because he argues that he would have been able to perform his job had he been provided reasonable accommodations. . . ."). In the case presently before the court, the record evidence indicates that Aetna's determination that Abbate was "totally disabled" did not consider Abbate's ability to perform the essential functions of her job with reasonable accommodation. Thus, the statements at issue do not present an irreconcilable direct conflict, and Cendant is not entitled to summary judgment on a theory of estoppel.

Next, Cendant argues that Abbate's ADA claim fails because she cannot show that she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation. Although Cendant concedes that Abbate met the necessary prerequisites for the position of real estate analyst, it argues that she cannot satisfy the otherwise qualified prong of the prima facie case[5] because she has not produced a copy of the doctor's note that she claims she sent to Saviano in December, 2001. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Second Circuit has held that "McDonnell Douglas requires only a minimal showing of qualification to establish a prima facie claim. [A plaintiff] only needs to

_____

[5]This is the only prong of the prima facie case that Cendant argues Abbate cannot satisfy.

demonstrate that she possess the basic skills necessary for the performance of [the] job."

Sista,445 F. 3d at 171 (citing Owens v. New York City Housing Auth., 943 F.2d 405, 409 (2d

Cir. 1991)).  Here, Abbate has testified that Dr. Cooper cleared her to return to work part-time in

December, 2001.  Abbate further testified that she was cleared without restrictions, except for

lifting heavy objects.  Although Cendant offers Saviano's affidavit, whereby she avers that she

did not receive a fitness for duty certificate for Abbate in December 2001 or January 2002,

Abbate testified that she mailed a medical release to Saviano in December 2001.   In addition,

when all inferences are drawn in favor of Abbate, Dr. Cooper's deposition testimony does not

contradict Abbate's contention.  Dr. Cooper testified that he did not always place copies of

medical release forms in his patients' files and that he may have released Abbate to work in late

2001 or early 2002.  He further testified that although he could not remember whether he

released Abbate, "it is consistent with what could occur during or following treatment, that

patients will sometimes feel better, stronger, and will go back to work temporarily, or will

attempt to go back to work and find they can't . . . ."  (Dkt. # 50, Ex. Cooper Dep. at 35:11-15.)

Since the court must, for purposes of adjudicating the instant summary judgment motion, resolve

all factual disputes in favor of Abbate, the court finds that Abbate has produced sufficient

evidence to satisfy her burden at this stage in the analysis.

Abbate has also met her burden with respect to an accommodation.  "In general . . . it is

the responsibility of the individual with a disability to inform the employer that an

accommodation is needed."  Rodal v. Anesthesia Group of Onodaga, P.C., 369 F.3d 113, 120 (2d

Cir. 2004) (citing 29 C.F.R. pt 1630 app. § 1630.9).  The ADA requires covered employers to

provide "reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Here, Abbate testified that she asked her supervisor to accommodate her disability by allowing her to either work from home or to return to work part-time for few weeks until she was able to return full-time. Abbate has also adduced evidence showing that her requests were denied. Cendant does not dispute that Abbate requested these accommodations and that she did not receive these accommodations. Indeed, Tibbs provided deposition testimony whereby she admitted that, during the conversation of December 19, 2001, Abbate had asked to temporarily (1) return to work part-time, or (2) work from home. Tibbs further testified that it would not have been an undue hardship to allow Abbate to return to work part-time in December, 2001.[6] (See dkt. # 50, Ex. 2, Tibbs Dep. at 110-111.) Accordingly, Abbate has adduced sufficient evidence with respect to accommodations.

Cendant has met its burden of showing that there was a legitimate, non-discriminatory reason for Abbate's termination. For instance, Cendant has adduced documentary evidence showing that it warned Abbate that she would be administratively terminated if she was not released to return to work by December 20, 2001. In addition, Cendant has produced evidence that Abbate's medical leave had expired and that Cendant did not receive a fitness for duty certification that would have released Abbate to return to work.

Cendant's specific and substantiated offer of proof forces Abbate to produce evidence and ultimately carry the burden of persuasion that the proffered reason is a pretext for unlawful

_____

[6]A review of Cendant's papers reveals that it does not argue that either of the accommodations requested by Abbate were unreasonable or that they would have presented an undue hardship.

discrimination. A jury could find in Abbate's favor on each of her disability discrimination claims because, based upon the evidence submitted, she may be able to prove the following. First, she may be able to show that Cendant's proffered reasons were pretextual. A jury question on the issue of pretext may be created when an employer offers inconsistent and varying explanations for terminating an employee. Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001); Norville, 196 F.3d at 89; EEOC v. Ethan Allen, Inc., 44 F.3d 116 (2d Cir. 1994). Abbate has offered evidence showing that Cendant has offered varying and inconsistent explanations for her termination. For example, although Cendant now argues that Abbate was terminated for failing to provide a doctor's note that released her to return to work, Abbate offers Defendant's Responses to Plaintiff's First Set of Interrogatories and Requests for Production ("the Responses"). (See dkt. # 50, Ex. 5) In the Responses, Cendant maintained,

> at the time she went out on a leave of absence in August 2001[,] Plaintiff was employed as a Destination Consultant in the Destination Department providing telephone counseling to customers. That team was disbanded by end of 2001 and the positions in that department were eliminated, including Plaintiff's position.

(Id.) In addition, during Abbate's deposition, she was asked, "[t]he position you were in as of December '01 was destination consultant?" (Dkt. # 37, Ex. 2, Abbate Dep. at 21:23-25.) She was further asked, "[n]ow are you aware that at some point Cendant Mobility eliminated all the positions in the department in which you worked?" (Dkt. # 50, Ex. 1, Abbate Dep. at 42:2-4.) While the parties do not dispute that the Destination Department was disbanded by the end of 2001, it appears that Cendant abandoned the argument that Abbate was terminated due to corporate restructuring once it realized that Abbate held the post of real estate analyst, not destination consultant. Here, a jury could infer that Cendant was searching for a post hoc justification for Abbate's termination. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S.

133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Moreover, Abbate has established that there is a genuine issue of material fact with respect to whether she provided Cendant with a doctor's note that cleared her to return to work. For instance, she testified that she mailed Dr. Cooper's note to Saviano. In addition, Dr. Cooper testified that he may have released Abbate to work in late 2001 or early 2002. He further observed that Abbate's return to work would be "consistent with what could occur during or following treatment, that patients will sometimes feel better, stronger, and will go back to work temporarily, or will attempt to go back to work and find they can't . . . ." (Id., Ex. 3, Cooper Dep. at 35:11-15.) Thus, a jury could conclude that Dr. Cooper had cleared Abbate to return to work in December 2001 and that Abbate provided the requisite authorization to Cendant.

Abbate has also produced evidence upon which a reasonable jury could find that disability discrimination occurred. She has offered evidence showing that, during the telephone conversation of December 19, 2001, Tibbs did not consider the possibility of Abbate returning to work part-time or working from home, despite the fact that three other individuals in the real estate department, including one real estate analyst, were allowed to work part-time. (Id., Ex. 1, Abbate Dep. at 21:13-22.) According to Abbate, Tibbs commented that such accommodations would not be fair to her coworkers. Abbate has also offered Tibbs' testimony that as early as October 2001,while she was still out on medical leave, Cendant had already begun advertising for the position of real estate analyst. Lastly, Abbate has offered evidence indicating that she did not receive Saviano's letter of December 18, 2001, which warned that a failure to return to

Cendant by December 20, 2001, would result in administrative termination, until December 21, 2001. A reasonable trier of fact considering these pieces of evidence could conclude that discriminatory animus played a role in Abbate's termination. As such, to the extent Cendant seeks summary judgment on Abbate's claims that Cendant terminated her in violation of the ADA, its motion is **DENIED.**

## C.  ADEA WRONGFUL DISCHARGE CLAIM

Abbate argues that her employer discriminated against her on the basis of her age in violation of the ADEA, see 29 U.S.C. §§ 621 et seq. The ADEA seeks to "promote employment of older persons based on their ability rather than age . . . [and] to prohibit arbitrary age discrimination in employment. . . ." 29 U.S.C. § 621(b). In addition, the ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Wrongful discharge claims brought pursuant to the ADEA are subject to the analysis set forth in McDonnell Douglas Corporation v. Green.[7] Under that framework, a plaintiff alleging a violation of the ADEA must establish a prima facie case by showing that: "(1) at the time of discharge she was at least 40 years of age, (2) her job performance was satisfactory,[8] (3) she was discharged, and (4) her discharge occurred under circumstances giving rise to an inference of

---

[7]Title VII principles are applicable to ADEA cases since the substantive prohibitions of the ADEA were derived in haec verba from Title VII. Lowe v. Commack Union Free Sch. Dist., 886 F.2d 1364, 1369 (2d Cir. 1989).

[8]This element is alternatively formulated as "qualified for the job." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001) (citing Carlton, 202 F.3d at 134).

discrimination on the basis of age." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir.

1997). "The burden of establishing a prima facie case is not a heavy one. One might

characterize it as minimal." Carlton v. Mystic Transp., Inc., 202 F. 3d 129, 134 (2d Cir. 2000). If

the plaintiff establishes a prima facie case, the employer has the burden of articulating a

"legitimate, nondiscriminatory reason" for the adverse employment action. Stern v. Trustees of

Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997). If the employer does so, the plaintiff must

prove by a preponderance of the evidence that the employer's proffered explanation is unworthy

of credence, and that the true reason for the employer's action was discrimination. See id.

Abbate's ADEA claim fails because, even when viewing the evidence in a light most

favorable to her, she cannot satisfy the fourth prong of the prima facie case.[9] Abbate argues that

she can satisfy the fourth element, an inference of discrimination, because (1) she was treated

less favorably than similarly situated younger employees; (2) she was replaced by younger

employees; and (3) she "was getting near the 60-year-old mark, and . . . felt that they would be

hiring younger people at a lower salary." (Dkt. # 50, Ex. 1, Abbate Dep. at 20:2-6).

An inference of discrimination, may arise if a plaintiff can show the adverse actions she

complains of resulted in the plaintiff being treated less favorably than employees outside the

plaintiff's protected group that are "similarly situated in all material respects." Shumway v.

United Parcel Serv., 118 F. 3d 60, 64 (2d Cir. 1997); Graham v. Long Island R.R., 230 F. 3d 34,

40 (2d Cir. 2000) (internal citations and quotations omitted). This means that "where a plaintiff

---

[9]She has satisfied the first three elements of the prima facie case because she has adduced
evidence showing that: (1) she was a member of the protected class because she was over forty
years of age on the date of her termination; (2) she was qualified for the position, see supra
Section B; and (3) she suffered an adverse employment action, i.e.,termination.

seeks to establish the minimal <u>prima</u> <u>facie</u> case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." <u>McGuinness v. Lincoln Hall</u>, 263 F. 3d 49, 54 (2d Cir. 2001). Here, Abbate argues that her supervisor, Tibbs, and Jill Gross ("Gross"), two younger employees, were allowed to return to work on a part-time basis following medical leaves of absence. With respect to Tibbs, Abbate concedes that she returned to work following abdominal surgery. With respect to Gross, Abbate has not indicated what position she held or why she went on medical leave. Accordingly, even when viewing the evidence in the light most favorable to Abbate, she cannot, as a matter of law, establish that she held a position of similar rank to Tibbs and Gross, or that she was were similarly situated, in all material respect, to Tibbs and Gross. As such, Abbate cannot establish a <u>prima</u> <u>facie</u> case of age discrimination by making reference to the disparate treatment of other similarly situated employees.

Although, in her opposition papers, Abbate argues that her replacement by a younger person is evidence of age discrimination, her argument fails because she offers no evidence showing that, after Cendant terminated her, it filled the post of "real estate analyst" with a younger employee. Thus, to the extent Abbate attempts to establish an inference of discrimination by arguing that she was replaced by a younger employee, her claim fails because she offers no evidence in support of this assertion.

Nor can Abbate make a <u>prima</u> <u>facie</u> showing of age discrimination by observing that she felt that age played a role in her termination because she "was getting near the 60-year-old mark, and . . . felt that they would be hiring younger people at a lower salary," (Dkt. # 50, Ex. 1, Abbate

Dep. at 20:2-6). Although Abbate's feelings may be heartfelt, she has offered no evidence in support of this allegation, and her gut feeling without more, is not enough to establish an inference of discrimination. <u>Hawana v. City of New York</u>, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002) ("[P]laintiff's personal conclusory assumptions are insufficient to support. . . an inference [of discrimination]."); <u>Little v. New York</u>, 96 Civ. 5132, 1998 WL 306545, at * 6 (E.D.N.Y. June 8, 1998) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn. . . . Accordingly, a Title VII plaintiff cannot 'defeat a motion for summary judgment by offering purely conclusory allegations of discrimination.' "), <u>aff'd</u>, 173 F. 3d 845 (2d Cir. 1999).

Accordingly, even when viewing the evidence in the light most favorable to Abbate, she cannot satisfy her <u>de minimis</u> burden of establishing a <u>prima facie</u> case of age discrimination. Abbate has not, as a matter of law, offered evidence upon which a reasonable jury could conclude that her termination occurred under circumstances giving rise to an inference of age discrimination. <u>See</u> <u>Schnabel v. Abrahmson</u>, 232 F.3d 83, 91 (2d Cir. 2000) ("summary judgment was appropriate in the case at bar, for plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that age was a determinative factor in defendants' decision to fire him.") Accordingly, to the extent Cendant argues that it is entitled to summary judgment on Abbate's claim that she was terminated in violation of the ADEA, its motion is **GRANTED.**

## D. ADA FAILURE TO REHIRE CLAIM

Abbate argues that Cendant discriminated against her in violation of the ADA when it failed to rehire her. Cendant argues that the court should dismiss this claim because Abbate did not exhaust her administrative remedies. Specifically, Cendant observes that Abbate did not include this claim in her EEOC complaint and that she did not amend her EEOC complaint to include this charge.

A district court may hear only claims that are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is "reasonably related" to those alleged in the EEOC charge. Butts v. City of New York Dep't of Hous., 990 F. 2d 1397, 1401 (2d Cir. 1993). This exhaustion requirement applies to claims brought pursuant to the ADA. See Cavallaro v. Corning Inc., 93 F. Supp. 2d 334, 339-40 (W.D.N.Y. 2000) ("This exhaustion requirement is an essential element of the ADA's statutory scheme."). As the Second Circuit has observed, the exhaustion requirement is designed to give the EEOC sufficient opportunity to investigate claims, encourage their resolution, and take remedial measures. Butts, 990 F. 2d at 1401-02. Here, a review of Abbate's Notice of Charge of Discrimination lists "12/20/2001" as the earliest date of the alleged violation and "12/20/2001" as the most recent date of the violation. (See Dkt. # 40, Ex. 1.) Thus, Abbate's claim that Cendant failed to rehire her in 2003 was not included in her EEOC charge. (See id.) Because Abbate did not include the failure to rehire claim in her EEOC charge and because she did not subsequently amend her EEOC charge to include this claim, the court must determine whether Abbate's failure to rehire claim is "reasonably related" to those alleged in the EEOC charge; i.e., that she was terminated because of her disability and age.

A claim is "reasonably related" to conduct alleged in an EEOC charge if it meets one of three tests. <u>Butts</u>, 990 F. 2d at 1402. First, a claim is "reasonably related" if the alleged conduct would fall within the scope of any EEOC investigation which would reasonably be expected to arise from the EEOC charge. <u>Id.</u> This "loose pleading" concept recognizes that EEOC charges are often filed by employees without the benefit of counsel. <u>Id.</u> Second, a claim is "reasonably related" if it alleges retaliation against the employee for the filing of an EEOC charge. <u>Id.</u> In this type of case, the exhaustion requirement is "relaxed" because of the close connection between the retaliatory act and the filing of the EEOC charge. <u>Id.</u> Third, a claim is "reasonably related" if it alleges further incidents of discrimination which are "carried out in precisely the same manner alleged in the EEOC charge." <u>Id.</u> at 1402-03. In such cases, the purposes behind the exhaustion requirement are satisfied because the EEOC has had the opportunity to investigate the means of discrimination as carried out in the prior incidents. <u>Id.</u> at 1403.

Abbate, who filed the administrative charges without the assistance of counsel, argues that the "loose pleading" test applies to her case.[10] This argument fails, however, because several courts have held that a failure to rehire claim is not "reasonably related" to an EEOC charge alleging discriminatory discharge. <u>See</u> <u>Miller v. Int'l Tel. and Tel. Corp.</u>, 755 F. 2d 20, 25-26 (2d Cir. 1985) ("There would be no reason for the EEOC to investigate the failure to rehire in connection with the claim of alleged discriminatory discharge unless the former were asserted as part of that claim . . . ."); <u>Owens</u>, 934 F. 2d at 411("<u>Miller</u> holds only that a failure to rehire claim is not 'reasonably related' to a claim based on an earlier dismissal."), <u>abrograted on other grounds</u>, <u>Thornley v. Penton Pub., Inc.</u>, 104 F.3d 26 (2d Cir. 1997); <u>see also</u> <u>Sauzek v. Exxon</u>

---

[10]Abbate, who is now represented by counsel, does not argue that the second or third tests apply.

Coal USA, Inc., 202 F.3d 913, 920 (7th Cir. 2000) ("An EEOC charge alleging age discrimination in a termination alerts neither the EEOC nor the employer that a charge of discriminatory failure to rehire may be forth coming. Thus, to properly maintain both a termination claim and a failure to rehire claim, plaintiff must include both allegations in charges with the EEOC."); Parisi v. Boeing Co., 400 F. 3d 583, 586 (8th Cir. 2005) (holding that a refusal to hire is a discrete employment action, and refusals to hire that occurred subsequent to the timely filed EEOC charge "are not like or reasonably related to the claims in [the] administrative charge" because the timely filed administrative charge asserted only a single incident of a refusal to hire on a specific date). Accordingly, the court finds that Abbate's claim that Cendant failed to rehire her in 2003, in violation of the ADA is not "reasonably related" to her charge that Cendant terminated her in 2001, in violation of the ADA. Thus, as a matter of law, the court finds that Abbate has not administratively exhausted her ADA failure to rehire claim and that Cendant is entitled to summary judgment on this claim.

## E. ADEA FAILURE TO REHIRE CLAIM

Abbate also argues that Cendant discriminated against her in violation of the ADEA when it failed to rehire her. Cendant argues that the court should dismiss this claim because Abbate did not exhaust her administrative remedies. Specifically, Cendant observes that Abbate did not include a failure to rehire claim in her EEOC complaint and that she did not amend her EEOC complaint to include this charge. As previously noted, a district court may hear only claims that are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is "reasonably related" to those alleged in the EEOC charge. Butts, 990 F. 2d at 1401. This exhaustion requirement applies to claims brought pursuant to the ADEA. Miller, 755

24

F. 2d at 23-24 ("No action based on a claim of age discrimination may be brought in federal court unless the claim was properly raised with the EEOC . . . ."), cert. denied, 474 U.S. 851 (1985).  Here, a review of Abbate's Notice of Charge of Discrimination lists "12/20/2001" as the earliest date of the alleged violation and "12/20/2001" as the most recent date of the violation. (See Dkt. # 40, Ex. 1.)  Thus, Abbate's claim that Cendant failed to rehire her in 2003 was not included in her EEOC charge.  (See id.)  Because Abbate did not include the failure to rehire claim in her EEOC charge and because she did not subsequently amend her EEOC charge to include this claim, the court must determine whether Abbate's failure to rehire claim is "reasonably related" to those alleged in the EEOC charge; i.e., that she was terminated because of her disability and age.

As previously discussed, a claim is "reasonably related" to conduct alleged in an EEOC charge if it meets one of the three tests that the Second Circuit set forth in Butts.  Butts, 990 F. 2d at 1402.  Although Abbate argues that the first Butts test, the "loose pleading" test, applies to her case,[11] her argument fails because several courts have held that a failure to rehire claim is not "reasonably related" to an EEOC charge alleging discriminatory discharge.  See Miller, 755 F. 2d at 25-26 ("There would be no reason for the EEOC to investigate the failure to rehire in connection with the claim of alleged discriminatory discharge unless the former were asserted as part of that claim . . . ."); Owens, 934 F. 2d at 411("Miller holds only that a failure to rehire claim is not 'reasonably related' to a claim based on an earlier dismissal."), abrogated on other grounds, Thornley, 104 F.3d 26; see also Sauzek, 202 F.3d at 920 ("An EEOC charge alleging age discrimination in a termination alerts neither the EEOC nor the employer that a charge of

_____

[11]Abbate does not argue that the second or third tests apply.

discriminatory failure to rehire may be forth coming. Thus, to properly maintain both a termination claim and a failure to rehire claim, plaintiff must include both allegations in charges with the EEOC."); Parisi, 400 F. 3d at 586 (holding that a refusal to hire is a discrete employment action, and refusals to hire that occurred subsequent to the timely filed EEOC charge "are not like or reasonably related to the claims in [the] administrative charge" because the timely filed administrative charge asserted only a single incident of a refusal to hire on a specific date). Accordingly, the court finds that Abbate's claim that Cendant failed to rehire her in 2003, in violation of the ADEA is not "reasonably related" to her charge that Cendant terminated her in 2001, in violation of the ADEA. As a matter of law, the court finds that Abbate has not administratively exhausted her ADEA failure to rehire claim. Thus, to the extent Cendant moves for summary judgment on Abbate's ADEA failure to rehire claim, its motion is **GRANTED.**

## III. CONCLUSION

For the foregoing reasons, Cendant's motion for summary judgment **(dkt. # 34)** is **GRANTED in part and DENIED in part**. To the extent Cendant seeks summary judgment on Abbate's claim that Cendant terminated her in violation of the ADA, its motion is **DENIED.** To the extent Cendant argues that it is entitled to summary judgment on Abbate's claim that she was terminated in violation of the ADEA, its motion is **GRANTED**. To the extent Cendant argues that it is entitled to summary judgment on Abbate's ADA and ADEA failure to rehire claims, its motion is **GRANTED.**

**The parties shall file a joint trial memorandum on or before August 24, 2007.**

**IT IS SO ORDERED** at Hartford, Connecticut, this <u>13th</u> day of July, 2007.


**/S/DJS**

_____

**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**
